1
2
3
4
5
6
7
8                  UNITED STATES DISTRICT COURT

9             FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11  Victor Manuel Brito Sanchez,                 No. 2:18-CV-00097-KJM-DB

12                      Plaintiff,               ORDER

13          v.

14  Merrick Garland, United States Attorney
    General,
15
                        Defendant.
16

17          The Ninth Circuit Court of Appeals transferred this action to this court to resolve a

18  genuine issue of material fact as to the claim of plaintiff[1] Victor Manuel Brito Sanchez (Brito) to

19  be a United States citizen.  Transfer Order, ECF No. 1.

20          The government previously established a presumption that Brito was born in Mexico.  *See*

21  Order (July 15, 2020), ECF No. 27.  As explained in this order, Brito has now rebutted that

22  presumption by substantial credible evidence.  *See Mondaca-Vega v. Lynch*, 808 F.3d 413, 419

23  (9th Cir. 2015).  The burden thus shifts back to the government to prove "by clear, unequivocal,

24  and convincing evidence" that Brito is removable.  *See Berenyi v. Dist. Dir.*, *INS*, 385 U.S. 630,

25  636 (1967); *see also Mondaca-Vega*, 80 F.3d at 419.  The government has not carried its burden.

---

[1] The parties adopt the labels "plaintiff" and "defendant" before this court and the court
follows that convention here.

1

# I.    BACKGROUND

The United States claims Brito was born in Mexico and is inadmissible to the United States.  It sought his removal to Mexico in immigration proceedings, and an immigration judge ordered his removal in early 2017.  *See* Pet. Ex. A at 1, *Brito v. Garland*, No. 17-72066 (9th Cir. filed July 19, 2017), Dkt. No. 1-3.  In reaching that conclusion, the immigration judge rejected Brito's claim that he was born in California and thus a United States citizen.  *See id.* at 1–2.  Brito appealed, and the Board of Immigration Appeals affirmed.  *See generally id.*  Brito then petitioned the Ninth Circuit for relief.  *See* Pet., *Brito v. Garland*, No. 17-72066 (9th Cir. filed July 19, 2017), Dkt. No. 1.  The Ninth Circuit found Brito had presented a "genuine issue of material fact" about his nationality under 8 U.S.C. § 1252(b)(5)(B) and transferred the proceedings to this court to review his citizenship claim de novo.  *See generally* Transfer Order.

Following a period for discovery, the United States moved for summary judgment.  *See* Mot. Summ. J., ECF No. 20.  Brito opposed the motion, and the government replied.  *See* Opp'n, ECF No. 21; Reply, ECF No. 22.  In deciding the summary judgment motion, the court has followed the three-step process the Ninth Circuit prescribes for determining whether the government has carried its burden to prove a person is removable when that person's U.S. citizenship is in dispute:

1.    If the government offers evidence that the person was not born in the U.S., a "rebuttable presumption of alienage" arises.  *Mondaca-Vega,* 808 F.3d 413 (en banc) (quoting *Chau v. INS*, 247 F.3d 1026, 1029 n.5 (9th Cir. 2001)).

2.    The alleged non-citizen may rebut the presumption by producing "substantial credible evidence" of U.S. citizenship.  *Id.*  (quoting *Chau*, 247 F.3d at 1029 n.5).

3.    The burden of proof then shifts back to the government.  *See id.*  It can prevail only by producing "clear and convincing evidence" the person is removable.  *Id.* (quoting *Ayala–Villanueva v. Holder*, 572 F.3d 736, 737 n.3 (9th Cir. 2009)).

First, the government presented evidence of Brito's birth in Mexico: a birth certificate issued by the government of Mexico, which states Brito was born in Coatlan del Rio, Morelos, Mexico.  *See* Order (July 15, 2020) at 8–12.  The birth certificate is accompanied by a sworn

2

1    statement of its authenticity and a signed certification by a Vice Consul of Mexico.  *See* Lawrence

2    Decl. Ex. A, ECF No. 20-2.  The document correctly identifies Brito's parents and grandparents

3    and was generated at the request of his paternal grandmother.  *See id.*; *see also* Lopez Dep. Tr.

4    86:23–88:23, ECF No. 20-3; Lawrence Decl. Ex. B, ECF No. 20-3 (identifying parents' and

5    grandparents' names on the certificate).  In the first instance, therefore, the government has

6    established a rebuttable presumption that Brito was not a U.S. citizen.  *See generally* Order (July

7    15, 2020), ECF No. 27; *Huizar-Perez v. Mukasey*, 292 F. App'x 538 (9th Cir. 2008) (holding

8    Mexican birth certificate provides evidence of foreign birth, giving rise to rebuttable presumption

9    of alienage).

10       At the second step, Brito offered evidence of his birth in the United States, including a

11    declaration and deposition testimony from his mother.  *See generally* Lopez Decl., ECF No. 21-1.

12    Lopez Dep. Tr. at 12.  The court could not determine whether this purely documentary evidence

13    met the test of  "substantial" and "credible" without conducting a trial.  *See* Order (July 15, 2020)

14    at 13–15.

15       A one-day bench trial went forward by videoconference in February 2021.  *See* Minutes,

16    ECF No. 57; Trial Tr., ECF No. 61.  Brito presented testimony from two witnesses: his mother,

17    Rosa Lopez, Trial Tr. at 10–64, and Gretchen Kuhner, offered as an expert in "the social practice

18    of dual registration," *id.* at 71.  "Dual registration" occurs when "people are registered more than

19    once within Mexico" or are registered "both in the United States as well as in Mexico."  *Id.* at 66.

20    The government called one witness, Marco Grasso, an officer with Immigration and Customs

21    Enforcement who had investigated Brito's citizenship before removal proceedings began.  *See id.*

22    at 96–130.  The parties submitted written closing arguments addressing the second step as well as

23    third step and proposed findings of fact and conclusions of law.  *See* Gov't's Proposed Findings

24    of Fact & Conclusions of Law (Gov't Br.), ECF No. 64; Pl. Closing Args. (Pl. Br.), ECF No. 66-

25    2; Gov't Resp. Closing Args. (Gov't Resp.), ECF No. 67; Pl. Obj. to Proposed Findings of Fact &

26    Conclusions of Law (Pl. Resp.), ECF No. 68.[2]  Having carefully considered the testimony and

---

[2] To the extent any objections are directed to evidence before the court, the court has considered the evidence of record and relies here only on evidence that is admissible.

1   evidence introduced at trial, reviewed the record and considered the parties' arguments, the court

2   finds as follows.

3   **II.     LEGAL STANDARD**

4          As noted above, the government "bears the ultimate burden of establishing all facts"

5   supporting a charge that a person is removable, and it must do so "by clear, unequivocal, and

6   convincing evidence." *Mondaca-Vega*, 808 F.3d at 419 (quoting *Chau,* 247 F.3d at 1029 n.5).

7   When a person's U.S. citizenship is in dispute, the government may establish a presumption that

8   the person is not a U.S. citizen by offering evidence of that person's birth in another country. *Id.*

9   It is undisputed here that the government established this presumption by producing a certificate

10  registering Brito's birth in Mexico. *See* Order (July 15, 2020) at 8–12; Pl. Pretrial Br. at 1, ECF

11  No. 47. To rebut this presumption, Brito must "present substantial credible evidence of

12  citizenship by proving to the trier of fact, *by a preponderance of the evidence*, that he is a citizen"

13  of the United States. *Giha v. Garland*, 12 F.4th 922, 930 (9th Cir. 2021) (emphasis in original).[3]

14         The parties disagree about the definition of the phrase "substantial credible evidence."

15  Brito defines "substantial credible evidence" as "more than a mere scintilla" but "less than a

16  preponderance." *See* Pl. Pretrial Br. at 1 (quoting *Rivera v. Mukasey*, 508 F.3d 1271, 1274 (9th

17  Cir. 2007)). The government argues a plaintiff's burden to produce "substantial credible

18  evidence" is not defined by reference to the "substantial evidence" standard of appellate review to

19  which plaintiff's definition is tied. *See* Gov't Resp. at 4–5. In the government's view, it would

20  be inappropriate to adopt a deferential standard of appellate review here because this court is not

21  conducting an appellate review, but rather is sitting as a fact-finder in the first instance. *See id.* at

22  5. Rather, the government argues the court must weigh the evidence on the issue of citizenship

23  by determining whether plaintiff has presented "substantial credible evidence," defined by its

24  plain meaning, that he was born in the United States. *Id.* (citing *Tiznado-Reyna v. Barr*, 753 F.

25  App'x 431, 432 (9th Cir. 2019)). The parties' dispute is mooted by the Ninth Circuit's recent

---

[3] *Giha* was decided after the close of briefing. Neither party filed a notice of new authority alerting the court to the case, but the court located it in finalizing this order. Given that it is now controlling authority instructing on the standard district courts are to use in resolving disputed claims of U.S. citizenship, the court applies it here.

1 decision in *Giha* noted above, clarifying that presenting "substantial credible evidence" means

2 proving "*by a preponderance of evidence* that [one] is an American citizen." *Giha*, 12 F.4th at

3 931 (emphasis in original).  While this court had adopted the "substantial credible evidence"

4 definition proposed by Brito in its earlier order denying the government's motion for summary

5 judgment, *see* Order (July 15, 2020) at 13–15, that portion of the court's decision also is

6 superseded by *Giha*.

7 **III. FINDINGS OF FACT**

8  **A. Brito's Family History and Birth**

9  Brito's mother and father both were born in Mexico.  Undisputed Facts (UF) No. 4, ECF

10 No. 43.  They began living together in Coatlan del Rio, Morelos, Mexico in about 1985.  *Id.*  In

11 1987, Ms. Lopez gave birth to a daughter, Elena Sanchez, in Mexico.  *See* Pl. Br. Ex. C at 7; Trial

12 Tr. at 12:7–12.  Approximately two years later, when Ms. Lopez was 18 and her daughter was

13 two, Brito's father brought the two family members to the United States.  Trial Tr. at 13:12–18,

14 19–20; UF No. 7.  They had no documentation.  Trial Tr. at 14:5–10.  Many other people came

15 with them, but Ms. Lopez cannot remember any of their names.  UF No. 7.  In the United States,

16 the three family members lived together on a ranch in Temecula, California.  Trial Tr. at 14:11–

17 17.  Ms. Lopez cleaned stables and helped care for the horses.  *Id.*  She was unpaid.  *Id.* at 18:9–

18 13.  She relied on Brito's father for food and anything else she needed.  *Id.* at 18:16–18.  He told

19 her not to go out.  *Id.* at 17:20–21.

20  According to Ms. Lopez, Brito was born at home on the ranch in Temecula on April 1,

21 1990.  *Id.* at 14:21–15:3; Administrative Record (AR)[4] 132:11–20.  She remembers the address

22 was on Pawa Road.  AR at 133:11–13; *see* Pl. Ex. C at 7.  Only the father, his sister, and a woman

23 named "Nancy" were present when Brito was born.  Trial Tr. at 15:5–6, 16:13–15.

24  Nancy's identity and whereabouts are unknown; Ms. Lopez never saw her again.  *Id.* at

25 19:13–16.  Ms. Lopez is no longer in contact with Brito's father.  *Id.* at 19:17–19.  She has not

26 spoken to him for more than fifteen years, *id.* at 19:20–21, and does not know how to find him,

---

[4] The court cites to the administrative record before the immigration judge.

1    *id.* at 19:25–20:11.  It is undisputed that the father's whereabouts are unknown.  UF No. 9.  Ms.

2    Lopez never visited a doctor during her pregnancy, she did not attempt to go to the hospital for

3    Brito's birth, and she did not seek medical attention immediately after his birth.  Trial Tr. at

4    17:16–18, 18:2–4.  Brito's father would not allow it.  *Id.* at 18:6–8.  Ms. Lopez does remember

5    taking Brito to a hospital in Wildomar, California in the first year of his life; because he was so

6    sick she was able to persuade the father to allow the visit, but she has no records of the visit.  *Id*.

7    at 18:19–19:12.  Nor does she have any photographs, other medical records, or government

8    documents showing he was born in the United States.  UF No. 6.

9         While the underlying administrative record does include a purported birth certificate from

10   the Inland Valley Regional Medical Center in Wildomar, California, *see* Trial Tr. at 128–30, the

11   court gives it no weight.  Neither party contends the document is evidence of Brito's birth in

12   California.  It lacks proper authentication, Ms. Lopez testified she had never seen it, and the

13   hospital has since closed.  Jt. Pre-Trial Statement at 5, ECF No. 29; *see also* AR at 4 & n.3.

14   While Officer Grasso testified he believed the certificate was falsified, *see* Trial Tr. at 128–30,

15   the court does not make any such determination.

16        **B.    Ms. Lopez's Credibility**

17        Given that Brito's position relies primarily on his mother's testimony, the court has

18   carefully considered whether Ms. Lopez, who testified through an interpreter, is credible as a

19   witness.  Although there is no documentary proof directly supporting Ms. Lopez's testimony

20   about Brito's birth in California, her testimony is credible.  At trial, her answers overall appeared

21   specific and responsive, and her manner was earnest.  As explained below, she was forthright,

22   even when her testimony was unflattering.  She remembered and explained details that lend

23   plausibility to her story and explain her motivations.

24        The government first argues Brito's mother is untrustworthy because she has given

25   inconsistent testimony about her relationship with her children's father, the births of her children,

26   and her own history.  Most of the statements the government cites are not actually inconsistent,

27   however.  It cites, for example, an apparent conflict between testimony Ms. Lopez offered in an

28   immigration proceeding in 2015 and her testimony in this case.  In 2015, she told an immigration

1    judge Brito's father was already in the United States when she arrived, not that they came into the

2    United States together as she testified before this court.  AR at 161–62; *see also* Trial Tr. at

3    13:12–18, 19–20; UF No. 7.  The government points to another discrepancy it says her trial

4    testimony here reflects, that she was both "together with" her children's father when her daughter

5    was born, *see* Trial Tr. at 12:15–17, and that she was not "with" him at that time, *see id.* at 30:10–

6    12.

7            Regarding Ms. Lopez's relationship with her children's father, a close look shows she

8    described their relationship consistently.  They were "together" when their daughter was born in

9    the sense that he was her "boyfriend."  *See* Trial Tr. at 13:7–8.  But as her boyfriend he was living

10   in the United States.  *See id.* at 30:22–31:6; Lopez Dep. at 17:6–24.  He stayed in the United

11   States and did not meet their daughter until she was two years old, when he arranged for Ms.

12   Lopez and the daughter to travel to Tijuana before they came to the United States.  *See* Trial Tr. at

13   31:7–32:6.  Ms. Lopez reunited with Brito's father in May 1989,  joining him in the United

14   States, and giving birth to his first son a little less than a year later.  *See id.* at 13:23–24, 15:2–3.

15           Regarding the birth of her children, Ms. Lopez's account of her son's birth has been

16   fundamentally consistent for many years, even before his citizenship status became the subject of

17   the charges in this case.  She has always said that Brito was born in California.  In 1995, when he

18   was five years old, for example, she filled out an application for child support and listed his

19   birthplace as Wildomar, California.  Pl. Br. Ex. C at 1.  On the same application, she reported

20   Brito's sister was born in Mexico, *see id.*, making a distinction in the birth location for different

21   children.  She also filed a petition seeking U Nonimmigrant Status for herself in August 2010[5]

---

[5]  As defined by statute, "*U nonimmigrant status certification* means Form I-918, Supplement B, 'U Nonimmigrant Status Certification,' which confirms that the petitioner has been helpful, is being helpful, or is likely to be helpful in the investigation or prosecution of the qualifying criminal activity of which he or she is a victim."  8 U.S.C. § 214.14(a)(12).  There is no I-918 Supplement B form in the record here, and the details related to Ms. Lopez's application itself do not appear to be material to the court's job to find the facts here.  Her application for a U-Visa placed Ms. Lopez on the U-Visa waiting list created by 8 C.F.R. § 214.14(d).  "Congress gave the Attorney General the authority to devise the system for processing applications—and ultimately granting or denying them."  *Butanda v. Wolf*, No. 120CV01155, 2021 WL 327714 (D. Colo. Feb. 1, 2021); 8 U.S.C. § 1184(a) ("The admission to the United States of any alien as a nonimmigrant

before the government charged Brito in this case. *See* Pl. Br. Ex. C at 8. In that application she wrote that Brito was born in the United States. *See* Pl. Br. Ex. C at 7. If he had been born in Mexico, lying about his birth country would have exposed her to automatic denial of her petition and left her vulnerable to be deported at any time. *See* 8 C.F.R. § 214.14(c)(4) ("Evidentiary standards and burdens of proof" section providing that U.S. Citizenship and Immigration Services evaluates a petitioner's eligibility and denies a petition "in its sole discretion" after reviewing "previously or concurrently submitted evidence . . ." and "investigat[ing] any aspect of the petition."). Brito was under 21 at the time, so his mother could have included him as a derivative applicant if he truly had been born in Mexico, which would have qualified him for lawful immigration status if her application were later granted, as it was. *See* 8 U.S.C. §§ 1101(a)(15)(U)(ii)(I), (II). In the same petition, she reported that Brito's older sister had been born in Mexico, consistently making the same distinction she had in the earlier child support form. *See* Pl. Br. Ex. C at 7.

The government also claims there is a conflict in Ms. Lopez's testimony about whether she "registered" her two youngest sons, Brito's younger brothers, who were both born in the United States. She testified at trial she had not "registered" the two boys in the United States, but one of her sons has a U.S. birth certificate. *See id*. at 23:24–24:4, 34:21–35:7. Any appearance of a contradiction is not substantiated by the record. Ms. Lopez understood "register" to mean that "you fill out a form establishing where the child was born." *Id.* at 24:14–17. She did not remember filling out any form to obtain a birth certificate. But if she did complete paperwork, it was decades ago, and the papers would have been in English, a language she did not speak well at the time, if at all. *See id*. 22:14–16. Brito's father often asked her to sign paperwork without

/////

/////

---

shall be for such time and under such conditions as the Attorney General may by regulations prescribe.").

1   explanation, so she might even have signed a request for a birth certificate without knowing.  *See*

2   *id.* at 35:8–12.  She also suspected he signed her name at times without asking.  *See id.* at 35:10–

3   12.

4        The government also argues Brito's mother gave inconsistent explanations for her

5   decision not to go to a hospital when Brito was born.  At trial, she said his father gave her no

6   choice.  "I did what he ordered me to do," she testified, and he said they could not go.  *Id.* at

7   17:16–21, 18:2–8.  In Brito's immigration proceeding in 2015, by contrast, she told the

8   immigration judge she did not go to a hospital because she did not know where a hospital was,

9   because she did not speak English, and because Brito's father did not take her to the hospital

10  when she was pregnant.  AR at 162.  When Brito was 1 month old, she did persuade Brito's father

11  to take them to a hospital by begging him to do so, in tears and in fear Brito would die if they did

12  not get medical help.  *See id.*  These explanations are not inconsistent.  Rather, Ms. Lopez has

13  essentially described the same problem in two different ways: she was isolated and dependent on

14  the boy's father, did not speak English, had no car and no money, did not know where to go, and

15  as a rule had no choice but to do what he said, with one exception when circumstances were so

16  dire she prevailed upon him through the only tools available to her.

17       Regarding Ms. Lopez's own history, the record does disclose one valid inconsistency in

18  her testimony, but it does not undermine her credibility.  During a hearing for Brito's immigration

19  proceedings in 2015 described above, she told the immigration judge she came to the United

20  States in December 1989, not May 1989:

21           JUDGE TO MS. BRITO:

22       Q.    Ma'am, when was it, the month and the year, the very first
23             time you came to the United States?

24       A.    It was in about December of '89.

25       Q.    And did you ever go back to Mexico?

26       A.    No.

9

1       Q.      Now, you got your green card last year in December,[6]
2               correct?

3       A.      Yes.

4    AR at 161.  This was the only time Ms. Lopez has said she came to the United States in

5    December 1989.  If the December date were correct, the rest of her story regarding when she

6    reunited with Brito's father would not hold together; they would have had to be together well

7    before December 1989 for Brito to have been conceived nine months before his birth in April

8    1990.  But every other time when asked, Ms. Lopez has said she entered the country in May

9    1989: in her written application for U Nonimmigrant Status, *see* Pl. Br. Ex. C at 1, in her

10   deposition testimony, *see* Lopez Dep. at 21:5–7, and at trial, Trial Tr. at 13:12–13.  She has also

11   credibly explained the inconsistency as a result of her confusing at one point the month she first

12   came to the United States and the month she received her green card.  *See* Lopez Dep. at 24:11–

13   15; Trial Tr. at 29:4–30:2.  It is undisputed she was granted legal residency in December 1989.

14   Trial Tr. at 29:6–10.

15        The government also argues Brito's mother should not be believed because in 2016, she

16   pled guilty to a misdemeanor offense under California Penal Code section 487(a), which punishes

17   thefts of money, labor or property worth more than $950.  UF No. 8.  Ms. Lopez testified without

18   evasion before this court about her conviction.  One of her youngest two sons is disabled, and the

19   other was a service provider who received money from the California Department of Health Care

20   Services for providing his care.  Trial Tr. at 51:1–11.  In 2012, the son who was providing care

21   was incarcerated, *see id.*, but the Department of Health Care Services continued depositing funds

22   in a family bank account for his services as care provider, *id.* at 51:16–19.  During this time, Ms.

23   Lopez signed time sheets as if her incarcerated son had continued providing care.  *See id.* at

24   51:23–52.  Later, however, she promptly accepted responsibility, admitted she had wrongly

25   deposited the payments, offered to reimburse them, and pled guilty to an offense under section

26   487(a).  *See id*. at 50:13–19, 58:16–20; *see also* Gov't Br. Ex. D.  The government is correct that

27   evidence of this conviction is admissible.  A party may attack a witness's character for

---

[6]  For clarity, the "last year" in context here was 2014.  *See* Trial Tr. at 24:18–25:8

truthfulness by offering evidence of a conviction "if the court can readily determine that establishing the elements of the crime require proving—or the witness's admitting—a dishonest act or false statement." Fed. R. Evid. 609(a)(2).  Not all theft convictions involve dishonesty or false statements, but some do, and the Ninth Circuit has held that a theft conviction "may be admissible under rule 609(a)(2) if the crime was actually committed by fraudulent or deceitful means." *United States v. Glenn,* 667 F.2d 1269, 1272–73 (9th Cir. 1982).  Here, Ms. Lopez admits she signed timesheets under the false pretense that her incarcerated son was providing care.  Her conviction is therefore admissible under Rule 609(a)(2).

Ms. Lopez also testified at trial that she now has an agreement with the Department of Health Care Services that permits her to receive payments for providing the care herself to her disabled son.  Trial Tr. at 51:23–53:3.  That the California Department of Health Care Services pays Ms. Lopez to take care of her son signifies that her acceptance of responsibility and correction of the matter has mitigated any inference of dishonesty.  *See Glenn,* 667 F.2d at1273 ("Although such crimes may indicate a lack of respect for the persons or property of others, they do not bear directly on the likelihood defendant will testify truthfully" (citation and internal quotations omitted)).

Taking account of all of the information reviewed above, the court finds Ms. Lopez credible.

**C.     The Registration of Brito's Birth in Mexico**

**1.     Ms. Lopez's Testimony**

Ms. Lopez's credible account of her son's birth in the United States raises the question: why did the Mexican government issue a birth certificate stating Brito was born in Coatlan del Rio, Morelos, Mexico?  Ms. Lopez has testified she does not know why or how Brito was registered in Mexico; she did not even know he had been registered in Mexico before the immigration proceedings here began.  AR at 164:1–3.  She denies ever traveling to Mexico herself to register Brito.  *See* Trial Tr. at 58:11–12.  She testified that the signature on the birth certificate is not hers.  AR at 138:13–17.  She believes Brito's father arranged for Brito's birth to be registered in Mexico and forged her signature; he once threatened to take the children away,

11

1    telling her "they wouldn't have any problems" because "he was going to register them in

2    Mexico." *Id*. at 163:20–25, 164:1–3.

3                    **2.      Ms. Kuhner's Testimony**

4           Brito also offered testimony from Gretchen Kuhner to explain why a person such as Brito

5    could have been registered in Mexico even if he had been born in the United States.  The

6    government previously moved to exclude Ms. Kuhner's opinions, but the court denied that

7    motion. *See* Order (Nov. 13, 2020), ECF No. 48.  Ms. Kuhner is an attorney with many years'

8    experience in migration studies, especially in Mexico. *See generally* Expert Disclosure, Mot. in

9    Limine Ex. A, ECF No. 36-1.  She has spent the last decade as the director of the Institute for

10   Women in Migration in Mexico City and has other work experience related to women who

11   migrate. *See id.* at 4–5.  In her current position she encounters many cases in which families are

12   seeking access to birth certificates, dual nationality certificates, immigration documents, and

13   immigration visas. *See* Trial Tr. at 66:1–5.

14          Ms. Kuhner testified that when Brito was born in 1990, "there was no access to or no right

15   to Mexican nationality, [no] automatic right . . . ." *Id*. at 81:7–11.  Mexican families living in the

16   United States without documentation "would come back to Mexico and register their children,"

17   even if their children had been born in the United States, "so that their children would have

18   Mexican nationality as well as the U.S. nationality . . . ." *Id.* at 81:12–15.  It is very common for

19   grandparents in the country to register a birth without the child or parents present in the country.

20   *See id*. at 88:5–9.  She testified, the grandparents "will go in and they say, you know, my son had

21   a child, and here's the name.  Here's the picture." *Id.*  There were many reasons for families'

22   doing this.  Fear of deportation was one: undocumented parents wanted their children to have

23   Mexican birth certificates in case members of a family with mixed citizenship status were

24   removed from the United States. *See id.* at 81:16–18.  Tradition was another reason:  parents

25   wanted their children to share their own nationality, and Mexican law did not ensure that would

26   occur without registration. *See id.* at 81:19–21.  Ms. Kuhner formed these opinions in interviews

27   with Mexican American parents about their experiences and social practices in 1990 with double

28   registration. *Id.* at 80:7–10.

Although Ms. Kuhner's opinions are admissible, they are not conclusive.  She never reviewed the Mexican birth certificate in question, and she does not have any specific knowledge of the birth registration practices for the municipality of Coatlan del Rio, where Brito's birth was registered and where the government alleges Brito was born.  *See* Trial Tr. at 79–80.  Ms. Kuhner only has a "sense of what social practices were in 1990 in terms of civil registries" and "double registration."  *Id*. at 80:7–10.  She can shed no light on whether the birth certificate was forged or improperly obtained or whether it could have been issued without Ms. Lopez's knowledge or her presence.  While the court credits Ms. Kuhner's knowledge of Mexican birth registration practices generally in the relevant time period, her opinions as applied to the local birth certificate at issue here have only limited weight.  *See Primiano*, 598 F.3d at 565 (noting expert may testify and fact-finder decides how much weight to give that testimony.)

Nonetheless, Ms. Kuhner's opinions have explanatory value.  A family of a child like Brito, born in the United States to Mexican nationals who do not possess a U.S. birth certificate for the child, would understandably be concerned about the potential for some family members' removal to Mexico.  Even with the child's birth here, the parents would not have the right to remain without authorization.  Consistent with these considerations, as one court has observed, "nearly half of the families with children born in the United States also register their U.S. citizen child's birth in Mexico."  *See Tapia-Felix v. Barr*, No. CV-15-01464, 2019 WL 2137314, at *7 (D. Ariz. May 16, 2019), *aff'd sub nom. Tapia-Felix v. Whitaker*, 827 F. App'x 691 (9th Cir. 2020), *cert. denied sub nom. Tapia-Felix v. Garland*, 141 S. Ct. 2520 (2021).

### 3.    Conclusion

In sum, the record regarding the birth certificate issued by the Mexican government supports the following conclusions:  The certificate itself appears to be authentic as an official government document but its formal issuance does not establish Brito's birth in Mexico.  Ms. Lopez credibly denies ever traveling to Mexico to register her son's birth, and it is undisputed the paternal grandmother registered Brito's birth.  No evidence shows that anyone who actually witnessed Brito's birth registered his birth in Mexico.  The legal conditions in Mexico in 1990 as credibly described by Ms. Kuhner support the inference that relatives of a child born in the United

1    States to Mexican parents had incentives to register the child's birth in Mexico and legally could

2    do so even if the child could claim U.S. citizenship.

3        **D.    The Government's Investigation**

4        The court also has carefully considered the testimony of the government's witness in

5    making its findings.

6        After Brito presented testimony from his mother and Ms. Kuhner, the government called

7    Immigration and Customs Enforcement Officer Grasso who had investigated Brito's citizenship.

8    Trial Tr. at 96.  In 2014, Officer Grasso was assigned to the Marin County Jail.  *Id.* at 98:5–9.  He

9    was working in an enforcement program intended to identify people who had been booked into

10   the jail and who might be in the United States without permission.  *Id.* at 98:8–15.

11       Brito was booked into the Marin County Jail several times while the officer was stationed

12   there.  *Id.* at 100:22–101:1.  Officer Grasso investigated Brito's immigration status and found

13   records listing inconsistent birthplaces for Brito, in California and Mexico.  *See id.* at 104:18–

14   105:3, 108:1–14; AR at 1289–93; Gov't Br. Ex. B.  He also searched a California database that,

15   in his experience, could reliably show if someone had been born in California, trying "various

16   combinations of [Brito's] surnames to be sure that . . . [he] wasn't missing a record for him."

17   Trial Tr. at 105:17–23.  He found no records of Brito's birth in California.  *See id*.  The officer

18   then checked with the Mexican consulate, which sent him a copy of the Mexican birth certificate

19   described above.  *See id*. at 108:6–111:22.

20       Officer Grasso also interviewed Brito and asked where he was born.  *Id.* at 113:15–25.

21   Brito told him he had been born in California and that his mother was attempting to obtain

22   documentation.  *See id.*  Officer Grasso did not interview Ms. Lopez about her son's birthplace,

23   citizenship or immigration status.  He did not recall "having a need to" do so and "did not make

24   an attempt" to inquire further or confirm Brito's place of birth.  *Id*. at 119:10–22.  He considered

25   the matter a "shut case" after he confirmed "official government channels" had provided a

26   Mexican birth certificate for plaintiff.  *Id*. at 112:1–25.  He did, however, investigate Ms. Lopez's

27   immigration status and criminal history.  *Id*. at 114:10–115:5.  In the course of that investigation,

28   /////

                                    14

he found the complaint for the misdemeanor case against Ms. Lopez and court records for the case from Marin County. *See id*.

While Officer Grasso was credible, he did not track down all the details needed to rebut the credible picture painted by Ms. Lopez's testimony, clarified with the explanations provided by Ms. Kuhner. His not asking Ms. Lopez about Brito's birth, and not considering the cultural context of the Mexican registration of the birth, rendered his investigation incomplete, as did his unquestioning reliance on information in databases that is not determinative of plaintiff's citizenship or immigration status.

## IV.   FINDINGS OF LAW

### A.   Brito's Burden: Preponderance of Evidence Standard Met

Brito has produced the necessary evidence to meet the "preponderance of the evidence" standard articulated in *Giha*, *supra*. His mother Ms. Lopez testified he was born in California, an obviously relevant fact in the question of his citizenship. For the reasons described in the court's findings of fact above, her testimony is credible. Her demeanor was credible. Her memory was detailed. Fundamentally, the birth of her son is something she reasonably remembers and knows about in meaningful detail. Ms. Lopez's deposition testimony and responses at trial were internally consistent and consistent with other documentary and testimonial evidence, including the claims in her petition for a U Nonimmigrant visa, her testimony before other tribunals and her application for child support benefits. She also has offered a credible explanation for the existence of the Mexican birth registration certificate and the circumstances giving rise to its creation, in the form of her testimony as bolstered by the expert testimony. The inconsistencies in Ms. Lopez's testimony were minor, to the extent there were meaningful inconsistencies at all. Finally, her conviction for wrongfully retaining money intended for the care of her disabled son does not undermine these conclusions. A reasonable fact-finder could credit Brito's evidence, find it worthy of belief and find it shows he was born in the United States.

The government contends Brito's evidence is not in the same class as evidence courts have found to be "substantial credible evidence" in other cases. *See* Gov't Resp. at 3–4. The government's argument depends on the court's accepting its characterization of Ms. Lopez's

1   testimony as "uncorroborated," which the court does not.  *See id.* at 3 ("[C]itizenship cases . . .

2   the Ninth Circuit [affirmed] since *Mondaca-Vega* . .  [have] relied on much more than the

3   testimony of a single interested witness in determining whether the plaintiff met the substantial

4   credible evidence burden.").  First, "[t]estimony should not be disregarded merely because it is

5   uncorroborated and in the individual's own interest." *Murphy*, 54 F.3d at 611.  And second, Brito

6   has not offered only the uncorroborated testimony of a single interested witness.  Ms. Lopez's

7   testimony is corroborated by her consistent past reports of Brito's U.S. birth made in government

8   documents, which she completed before his citizenship was in dispute.  As explained above, her

9   claims also have support in Ms. Kuhner's opinions.

10          **B.      The Government's Burden: Clear and Convincing Standard Not Met**

11              Because Brito has offered substantial credible evidence of his U.S. citizenship, the

12   presumption of his foreign birth "bursts." *Ayala–Villanueva*, 572 F.3d at 737 n.3.  The

13   government can prevail only by proving Brito is removable by "clear and convincing evidence."

14   *Giha*, 12 F.4th at 929.  The government has not carried that burden.  Its primary evidence of

15   Brito's foreign birth is the Mexican birth certificate.  But as explained below, there are reasons to

16   doubt the accuracy of all the contents of that document; the inferences the government would

17   have the court draw from the document's existence are not the only reasonable conclusions when

18   considering all the information in the record now before the court.

19              While Officer Grasso, the Immigration and Customs Enforcement officer, testified

20   credibly, his reliance on information in a database containing conflicting information, without

21   interviewing Ms. Lopez, is insufficient to meet the government's significant burden at this stage

22   of the analysis. *Cf. Gonzalez v. United States Immigr. & Customs Enf't*, 975 F.3d 788, 808 (9th

23   Cir. 2020) (evidentiary record undermined ICE's reliance on databases, noting "databases are

24   outdated and not updated properly" (quoting *Roy v. Cty. of Los Angeles*, No. CV1209012, 2016

25   WL 5219468, at *3–4 (C.D. Cal. Sept. 9, 2016))).  It was Ms. Lopez, after all, whom Brito told

26   the officer could corroborate his citizenship.  Officer Grasso also did not evaluate critically the

27   information contained in the Mexican birth certificate, which was registered three months after

28   Brito's undisputed birth date, with the delayed registration raising a potential red flag. *See* Gov't

1   Br. Ex. A; *Tiznado-Reyna v. Holder*, No. 14-02428, 2016 WL 3213221, at *5 (D. Ariz. June 10,

2   2016) ("A delayed birth certificate is entitled to less evidentiary weight than a contemporaneously

3   filed birth certificate.").  The government has not carried its burden to disprove Brito's U.S.

4   citizenship "by clear, unequivocal, and convincing evidence."  *Berenyi v. Dist. Dir.*, *INS*, 385

5   U.S. 630, 636 (1967).

6   **V.    CONCLUSION**

7         This court finds Brito has produced "substantial credible evidence," by a preponderance of

8   the evidence, of his U.S. citizenship.  The government has not shown by "clear, unequivocal, and

9   convincing evidence" that Brito is not a U.S. citizen.  On the record developed before this court,

10   Brito is a U.S. citizen.

11         The Clerk of Court is directed to serve a copy of this order on the Ninth Circuit.  Brito

12   shall file a report on the status of this court's proceedings with the Ninth Circuit within seven (7)

13   days of this court's decision.

14         IT IS SO ORDERED.

15   DATED:  December 10, 2021.

16

CHIEF UNITED STATES DISTRICT JUDGE