UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Victor Manuel Brito Sanchez,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>Merrick Garland, United States Attorney General,<br><br>　　　　Defendant. | No. 2:18-cv-00097-KJM-DB<br><br>**AMENDED ORDER** |

After the Board of Immigration Appeals affirmed a final order of removal for plaintiff Victor Manuel Brito Sanchez (Brito), the Ninth Circuit transferred this case to this court to conduct a de novo review of Brito's claim that he is a United States citizen. *See generally* Transfer Order, ECF No. 1. This court found in Brito's favor, *see* Dec. 10, 2021 Order at 2, ECF No. 69, and the government now moves the court to reconsider that decision, *see* Def.'s Mot., ECF No. 70-1. For the reasons discussed below, the court **grants** the government's motion and **supersedes** its previous order with this amended superseding order. Ultimately, however, the court's conclusion remains the same: Brito is a U.S. citizen.

I.    **BACKGROUND**

The United States claims Brito was born in Mexico and is inadmissible to the United States. It sought his removal to Mexico in immigration proceedings, and an immigration judge ordered his removal in early 2017. *See* Pet. Ex. A at 1, *Brito v. Garland*, No. 17-72066 (9th Cir.

filed July 19, 2017), Dkt. No. 1-3.  In entering that order, the immigration judge rejected Brito's claim that he was born in California and thus is a United States citizen.  *See id.* at 1–2.  Brito appealed, and the Board of Immigration Appeals affirmed.  *See generally id.*  Brito then petitioned the Ninth Circuit for relief.  *See* Pet., *Brito v. Garland*, No. 17-72066 (9th Cir. filed July 19, 2017), Dkt. No. 1.  The Ninth Circuit found Brito had presented a "genuine issue of material fact" about his nationality under 8 U.S.C. § 1252(b)(5)(B) and transferred the proceedings to this court to review his citizenship claim de novo.  *See generally* Transfer Order.

The Ninth Circuit prescribes a three-step process for determining whether the government has carried its burden of proving a person is removable when that person's citizenship is in dispute:

> 1. If the government offers evidence that the person was not born in the U.S., a "rebuttable presumption of alienage" arises. *Mondaca-Vega* [*v. Lynch*]*,* 808 F.3d 413, 419 [(2015)] (en banc) (quoting *Chau v. INS*, 247 F.3d 1026, 1029 n.5 (9th Cir. 2001)).
>
> 2. The alleged non-citizen may rebut the presumption by producing "substantial credible evidence" of U.S. citizenship.  *Id.* (quoting *Ayala–Villanueva v. Holder*, 572 F.3d 736, 737 n.3 (9th Cir. 2009)).
>
> 3. The burden of proof then shifts back to the government.  *See id.*  It can prevail only by producing "clear and convincing evidence" the person is removable.  *Id.* (quoting *Ayala–Villanueva v. Holder*, 572 F.3d at 737 n.3).

Order at 2, ECF No. 69.  Before trial, the parties stipulated that the government satisfied its burden at step one, creating a rebuttable presumption of Brito's alienage.  *See* Am. Joint Pretrial Statement at 4, ECF No. 35.

The court held a one-day bench trial by videoconference on February 24, 2021.  *See* Mins., ECF No. 57; Trial Tr., ECF No. 61.  Brito presented testimony from two witnesses: his mother, Rosa Lopez, Trial Tr. at 10–64, and Gretchen Kuhner, offered as an expert in "the social practice of dual registration," *id.* at 71.  "Dual registration" occurs when "people are registered more than once within Mexico" or are registered "both in the United States as well as in Mexico." *Id.* at 66.  The government's case focused on a birth certificate issued by the Mexican government, which states Brito was born in Coatlán del Río, Morelos, Mexico.  *See* Def.'s Ex. A.

2

The parties stipulated to the birth certificate's authenticity, *see* Trial Tr. at 36:25; *id.* at 37:1–8, and that it correctly identifies Brito's parents and grandparents, *see id.* at 40:5–25; *id.* at 41:1–14. Because the parties stipulated before trial that the first step of the Ninth Circuit's burden-shifting framework was satisfied, the parties addressed the second and third steps in their written closing arguments. *See* Gov't's Proposed Findings of Fact & Conclusions of Law (Gov't Br.), ECF No. 64; Pl.'s Closing Args. (Pl. Br.), ECF No. 66-2; Gov't's Resp. Closing Args. (Gov't Resp.), ECF No. 67; Pl.'s Obj. to Proposed Findings of Fact & Conclusions of Law (Pl. Resp.), ECF No. 68.

After considering the parties' arguments and the record, the court found Brito presented substantial credible evidence of citizenship, satisfying his step-two burden. Order at 15–16. The court further found the government did not carry its step-three burden of proving "by clear, unequivocal, and convincing evidence" that Brito is removable. *Id.* at 16–17.

The government now moves this court to reconsider its order under Rule 59(e), implicitly arguing the court committed clear error. *See generally* Def.'s Mot. In critiquing the court's order, the government advances many arguments, most of which are unpersuasive. *See*, *e.g., id.* at 15 n.8 (taking issue with court's failure to address the argument that Ms. Lopez was inconsistent in testifying her son's name is "Victor Sanchez" and "Victor Manuel Sanchez Brito," but not "Victor Manuel")[1]; *id.* at 19 n.14 (arguing court erred by citing a case about a delayed United States birth certificate in discussing Brito's delayed Mexican birth certificate); Lawrence Decl. ¶ 12, ECF No. 70-2 (incorrectly declaring court cited to and relied on deposition transcript

---

[1] In this respect, a sister court's observation is apt: "While the Court did not find it necessary to explicitly address each and every argument made in Petitioner's original briefing in its written order, this cannot be construed to suggest that the Court did not consider these same arguments earlier. In many respects, Petitioner's present motion for reconsideration is just a second attempt to present the same issues to this Court. This Court is unpersuaded by Petitioner's repetitive arguments, as this is not the purpose of motions for reconsideration under Fed. R. Civ. P. 59(e)." *Cox v. Calderon*, No. 92-3370, 1999 WL 35807875, at *3 n.2 (C.D. Cal. Aug. 18, 1999); *see also Malbon v. Pa. Millers Mut. Ins. Co.*, 636 F.2d 936, 939 n.8 (4th Cir. 1980) ("An argument to which sub silentio treatment is accorded may be simply deemed not to have required specific reference. . . . The argument may be deemed to have been considered, but to have been found insufficient in merit; it is not necessarily to be concluded that it must have been totally ignored.").

not in trial record in discussing Brito's father's role in Brito's Mexican birth registration).[2]  The government does, however, identify evidentiary errors that make reconsideration appropriate.  Specifically, the court concedes it erred by relying on (1) a 1995 child support application that was not admitted into evidence, *see* Order at 10, 15, and (2) a 2010 application for U Nonimmigrant Status beyond the limited purpose for which it was admitted, i.e., of showing Ms. Lopez made a consistent statement about where Brito was born.  *See* Trial Tr. at 55:16–56:11.  The government's motion for reconsideration is therefore granted.  The court first amends its factual findings to correct the errors above, then considers anew whether Brito has rebutted the presumption of foreign birth and if so, whether the government has produced clear and convincing evidence that Brito is removable.

---

[2] The government's counsel declares in relevant part:

> At pages 11 and 12 of the Court's Order, the Court summarized Ms. Lopez's testimony by including statements and theories made by Ms. Lopez at her deposition that she did not testify about at trial and are not otherwise in the trial record. The Court credited Ms. Lopez's deposition testimony that "Brito's father arranged for Brito's birth to be registered in Mexico, and forged her signature; he once threatened to take the children away, telling her they wouldn't have any problems because he was going to register them in Mexico.["] *See* Order at 11–12 (citing deposition testimony, internal quotations omitted).

Lawrence Decl. ¶ 12.  This passage does not correctly capture what the court's order says, in two ways.  First, in discussing Brito's father's role in the registration of Brito's birth in Mexico, this court cited only Ms. Lopez's testimony at trial and before the immigration judge, not her deposition testimony.  *See* Order at 11–12.  Furthermore, the court's language that government's counsel quotes above is supported by Ms. Lopez's testimony at trial and before the immigration judge.  *See, e.g.*, AR 163:18–164:3 (Ms. Lopez responding to question about "why someone registered [Brito's] birth in Mexico" by testifying that Brito's father threatened to take children away and "they would not have any problems" because "he was going to register them in Mexico"); *id.* at 164:6–9 (noting in different context "Brito's father . . . did everything"); Trial Tr. at 42:9–11 ("I never registered anything . . . . It was his father that did everything."); *id.* at 35:8–12 (regarding her signature on Brito's younger brother's birth certificate, Ms. Lopez testified: "It's possible that his father wrote that because, when I told you before that I did not register [Brito's two younger brothers], it was because probably his father did, and he probably put my name there.").

4

## II. BRITO'S CITIZENSHIP

### A. Findings of Fact

#### 1. Brito's Family History and Birth

Brito's mother and father both were born in Mexico. Undisputed Facts (UF) No. 4, ECF No. 43. They began living together in Coatlán del Río, Morelos, Mexico, in or about 1985. *Id*. In 1987, Ms. Lopez gave birth to a daughter, Elena Sanchez, in Mexico. *See* Trial Tr. at 12:7–12. Approximately two years later, when Ms. Lopez was eighteen, Ms. Lopez brought her daughter to Tijuana, and Brito's father accompanied the two family members across the United States-Mexico border. Trial Tr. at 31:7–10; *id.* at 33:4–6; UF No. 7. Neither Ms. Lopez nor her daughter had documentation. Trial Tr. at 14:5–10. Many other people came with them, but Ms. Lopez cannot remember any of their names. UF No. 7. In the United States, the three family members lived together on a ranch in Temecula, California. Trial Tr. at 14:11–17. Ms. Lopez cleaned stables and helped care for the horses. *Id.* She was unpaid. *Id.* at 18:9–13. She relied on Brito's father for food and anything else she needed. *Id.* at 18:16–18. He told her not to go out. *Id.* at 17:20–21.

According to Ms. Lopez, Brito was born at home on the ranch in Temecula on April 1, 1990. *Id.* at 14:21–15:3; Administrative Record (AR)[3] 132:11–20. She remembers the address was on Pawa Road. AR 133:11–13. In addition to Ms. Lopez, only Brito's father, Brito's sister, and a woman named "Nancy" were present when Brito was born. Trial Tr. at 15:5–6, 16:13–15. Nancy's identity and whereabouts are unknown; Ms. Lopez never saw her again. *Id.* at 19:13–16. Ms. Lopez is no longer in contact with Brito's father. *Id.* at 19:17–19. She has not spoken to him in more than fifteen years, *id.* at 19:20–21, and does not know how to find him, *id.* at 19:25–20:11; UF No. 9 (undisputed that Brito's father's whereabouts are unknown). Ms. Lopez never visited a doctor during her pregnancy, she did not attempt to go to the hospital for Brito's birth, and she did not seek medical attention immediately after his birth. Trial Tr. at 17:16–18, 18:2–4. Brito's father would not allow it. *Id.* at 18:6–8. Ms. Lopez does remember

---

[3] The court cites to the administrative record before the immigration judge.

taking Brito to a hospital in Wildomar, California, in the first year of his life; because he was so sick she was able to persuade the father to allow the visit, but she has no records of the visit. *Id*. at 18:19–19:12. Nor does she have any photographs, other medical records, or government documents showing he was born in the United States. UF No. 6.

While the underlying administrative record does include a purported birth certificate from the Inland Valley Regional Medical Center in Wildomar, California, *see* Trial Tr. at 128–30, the court gives it no weight. Neither party contends the document is evidence of Brito's birth in California. It lacks proper authentication, Ms. Lopez testified she had never seen it, and the hospital has since closed. Jt. Pre-Trial Statement at 5, ECF No. 29; *see also* AR 4 & n.3. While Officer Grasso testified he believed the certificate was falsified, *see* Trial Tr. at 128–30, the court does not make any such determination.

### 2. Ms. Lopez's Credibility

Given that Brito's position relies primarily on his mother's testimony, the court has carefully considered whether Ms. Lopez, who testified through an interpreter, is credible in her claim that Brito was born in the United States. Although there is no documentary proof directly supporting Ms. Lopez's testimony about Brito's birth in California, her testimony is credible. At trial, her answers were specific and responsive, and her manner was earnest. As explained below, she was forthright, even when her testimony was unflattering. She remembered and explained details that lend plausibility to her story and explain her motivations. In addition to testifying credibly at trial, Ms. Lopez has also given consistent accounts of Brito's birth for many years, even before his citizenship became the subject of the charges in this case. *See* Pl.'s Ex. C-1[4] at 7 (Ms. Lopez stating in August 2010 petition for U Nonimmigrant Status that Brito was born in the United States).

The government attacks Ms. Lopez's credibility by pointing out several alleged inconsistencies in her testimony and arguing that a prior conviction impugns her character for

/////

---

[4] The court relies on Ms. Lopez's petition for U Nonimmigrant Status only for its prior consistent statement regarding the location of Brito's birth.

1  truthfulness. *See generally* Gov't Br.; Def.'s Mot. The court addresses the five alleged
2  inconsistencies before turning to Ms. Lopez's prior conviction.

3  First, the government argues Brito's mother is untrustworthy because she has given
4  inconsistent testimony about her relationship with her children's father. At trial, Ms. Lopez
5  testified both that she was "together with" her children's father when her daughter was born, *see*
6  Trial Tr. at 12:15–17, and that she was not "with" him at that time, *see id.* at 30:10–12. But
7  fundamentally, the court finds she described their relationship consistently. They were "together"
8  when their daughter was born in the sense that he was her "boyfriend." *See* Trial Tr. at 13:7–8.
9  But as her boyfriend he had immigrated and was living in the United States. *See id.* at 30:22–
10 31:6. He met their daughter about a year and a half later, when she and Ms. Lopez immigrated to
11 the United States. *See* Trial Tr. at 12:7–8, 31:7–32:6.

12 Second, the government claims there is a conflict in Ms. Lopez's testimony about whether
13 she "registered" her two youngest sons, Brito's younger brothers, who were both born in the
14 United States. She testified at trial that she had not "registered" the two boys in the United States,
15 but one of her sons has a U.S. birth certificate. *See id*. at 23:24–24:4, 34:21–35:7. Any
16 appearance of a contradiction is not substantiated by the record. Ms. Lopez understood "register"
17 to mean that "you fill out a form establishing where the child was born." *Id.* at 24:14–17. She
18 did not remember filling out any form to obtain a birth certificate. But if she did complete
19 paperwork, it was decades ago, and the papers would have been in English, a language she did
20 not speak well, if at all. *See id*. at 22:14–16. Significantly, Brito's father often asked her to sign
21 paperwork without explanation, so she might have signed a request for a birth certificate without
22 knowing. *See id.* at 35:8–12. She also suspected he signed her name at times without asking.
23 *See id.* at 35:10–12.

24 Third, the government argues Brito's mother gave inconsistent explanations for her
25 decision not to go to a hospital when Brito was born. At trial, she said Brito's father gave her no
26 choice. "I did what he ordered me to do," she testified, and he said they could not go. *Id.* at
27 17:16–21, 18:2–8. In Brito's immigration proceeding in 2015, by contrast, she told the
28 immigration judge she did not go to a hospital because she did not know where a hospital was,

7

because she did not speak English, and because Brito's father did not take her to the hospital when she was pregnant. AR 162. When Brito was one month old, she did persuade Brito's father to take them to a hospital by begging him to do so, in tears and in fear Brito would die if they did not get medical help. *See id.* The court finds these explanations are not inconsistent. Rather, Ms. Lopez has essentially described the same problem using different words and phrases: She was isolated and dependent on Brito's father, did not speak English, had no car and no money, did not know where to go, and as a rule had no choice but to do what he said, with one exception when circumstances were so dire she prevailed upon him through the only tools available to her.

Fourth, the government argues Ms. Lopez testified inconsistently about Brito's father's whereabouts at the time Ms. Lopez entered the United States. At trial and in her deposition, Ms. Lopez testified she and Brito's father crossed the border together. *See* Trial Tr. at 13:12–20; *id.* at 32:1–3; UF No. 7 ("Ms. Lopez testified at her deposition that she came to the United States [as part of a group that included Brito's father]."). The government argues this testimony contradicts testimony Ms. Lopez gave in 2015 before the immigration judge in this case:

> JUDGE TO MS. BRITO:
>
> Q. And where was your son's father when you entered? Did he come with you?
>
> A. He was here.
>
> Q. He was already here?
>
> A. Yes.

AR 161–162 (quoted in Gov't Br. at 7).

Viewed properly, the court finds these statements do not contradict one another. At trial, Ms. Lopez testified she traveled to Tijuana without Brito's father. Trial Tr. at 33:4-5 ("He was waiting for me in Tijuana . . . ."); *id.* at 46:6–8. In journeying to Tijuana from Coatlán del Río, she would have traversed the majority of the country, a distance of about 1800 miles, at a minimum. *See* Google Maps, https://www.google.com/maps (showing alternative driving routes

of 1759, 1835 and 2066 miles from Coatlán del Río to Tijuana) (last accessed Aug. 14, 2022).[5] Ms. Lopez further testified she reunited with Brito's father in Tijuana and traveled with him to Temecula, California, *see* Trial Tr. at 33:4–6; 13:21–14:2, a distance of about seventy-five miles, *see* Google Maps, https://www.google.com/maps (showing alternative driving routes of 74.5 and 75 miles from Tijuana to Temecula) (last accessed Aug. 14, 2022). The last leg of this journey would have taken the couple across an international border, but Ms. Lopez testified the crossing was not notable. *See* Trial Tr. at 33:4–6 ("[W]e walked into the United States; but I didn't realize we were already here."). The unremarkable nature of the border crossing and the fact that Brito's father joined Ms. Lopez for only the last, relatively short part of her trip is not inconsistent with her 2015 testimony that he did not "come with" her on her journey to the United States and that he was already "here"—within 100 miles of Temecula—when she arrived in the area. Though Ms. Lopez's narrative may have varied at different times, the variations are matters of nuance and not credulity.

Fifth, the government highlights a related inconsistency about the timing of Ms. Lopez's migration. Here, the government's identification of a true inconsistency is valid. In 2015, Ms. Lopez testified before the immigration judge that she came to the United States in December 1989. AR 161. If she arrived in December, she would not have been with Brito's father when Brito was conceived, unless Brito was born quite prematurely, a matter not developed in the record. But Ms. Lopez testified two other times -- in her deposition and before this court -- that she entered the United States in May of that year. UF No. 7 ("Ms. Lopez testified at her deposition that she came to the United States in May 1989 . . . ."); Trial Tr. at 13:12–13. Though a potential red flag, this inconsistency does not eviscerate the court's finding that Ms. Lopez was credible. Participating via translator in proceedings held in her second language, she mistook by

---

[5] At various points in this order, including here, the court takes judicial notice of online distance calculations. *See United States v. Perea-Rey*, 680 F.3d 1179, 1182 n.1 (9th Cir. 2012) (taking judicial notice of Google map and satellite image as "source[ ] whose accuracy cannot reasonably be questioned"); *Stormans, Inc. v. Wiesman*, 579 U.S. 942, 136 n.1 (2016) (relying on distances calculated by Google Maps driving directions) (Alito, J., dissenting); *cf. Boyce Motor Lines v. United States*, 342 U.S. 337, 344 (1952) ("We may, of course, take judicial notice of geography.") (Jackson, J., dissenting).

six months the timing of an event transpiring more than twenty-five years before her 2015 testimony. *See Garcia Perez v. Holder*, 380 F. App'x 675, 678 (9th Cir. 2010) (unpublished) (finding inconsistencies in petitioner's testimony, "given through a translator, regarding events that took place over twenty years ago" could be "attributed to mere mistake and confusion, brought about by the passage of time and the limits of human memory"). She has been consistent since. The court credits Ms. Lopez's trial testimony that she entered the United States in May 1989.

In addition to arguing her testimony was inconsistent, the government also argues Ms. Lopez should not be believed because, in 2016, she pled guilty to a misdemeanor offense under California Penal Code section 487(a), which punishes thefts of money, labor, or property worth more than $950.[6] UF No. 8. Ms. Lopez testified without evasion before this court about this conviction. She explained that one of Brito's two younger brothers is disabled, and the other was a service provider who received money from the California Department of Health Care Services for providing his care. Trial Tr. at 51:1–11. In 2012, the son who was providing care was incarcerated, *see id.*, but the Department of Health Care Services continued depositing funds in a family bank account for his services as care provider, *id.* at 51:16–19. During this time, Ms. Lopez signed a time sheet as if her incarcerated son had continued providing care. *See id.* at 51:10–14. Later, however, she volunteered that she had done so, promptly accepted responsibility, offered to reimburse them, and pled guilty to an offense under section 487(a). *See id.* at 50:13–19, 58:16–20; *see also* Gov't Br. Ex. D. Importantly, Ms. Lopez also testified without contradiction at trial that she now has an agreement with the Department of Health Care Services that permits her to receive payments for providing the care herself to her disabled son.

---

[6] The government is correct that evidence of this conviction is admissible. A party may attack a witness's character for truthfulness by offering evidence of a conviction "if the court can readily determine that establishing the elements of the crime require proving—or the witness's admitting—a dishonest act or false statement." Fed. R. Evid. 609(a)(2). Not all theft convictions involve dishonesty or false statements, but some do, and the Ninth Circuit has held that a theft conviction "may be admissible under rule 609(a)(2) if the crime was actually committed by fraudulent or deceitful means." *United States v. Glenn,* 667 F.2d 1269, 1272–73 (9th Cir. 1982). Here, Ms. Lopez admits she signed timesheets under the false pretense that her incarcerated son was providing care. Her conviction is therefore admissible under Rule 609(a)(2).

Trial Tr. at 51:23–53:3.  The California Department of Health Care Services' decision to pay Ms. Lopez to care for her son rehabilitates Ms. Lopez's character for truthfulness.  Her acceptance of responsibility and correction of the matter has mitigated any inference of dishonesty.  *Cf.* Fed. R. Evid. 609(c)(1).

Taking account of all of the information reviewed above, the court finds Ms. Lopez credible.

### 3. The Registration of Brito's Birth in Mexico

#### a) Ms. Lopez's Testimony

Ms. Lopez's credible account of her son's birth in the United States raises the question: Why did the Mexican government issue a birth certificate stating Brito was born in Coatlán del Río, Morelos, Mexico?  Ms. Lopez has testified she does not know why or how Brito was registered in Mexico; she did not even know he had been registered in Mexico before the present immigration proceedings began.  AR 164:1–3.  She denies ever traveling to Mexico herself to register Brito.  *See* Trial Tr. at 58:11–12.  She testified that the signature on the birth certificate is not hers.  AR 138:13–17.  She believes Brito's father arranged for Brito's birth to be registered in Mexico at least in part because he once threatened to take the children away, telling her "they wouldn't have any problems" because "he was going to register them in Mexico."  *Id*. at 163:20–164:3.

#### b) Ms. Kuhner's Testimony

Brito offered testimony from Gretchen Kuhner to explain why a person such as Brito could have been registered in Mexico even if he had been born in the United States.  The government previously moved to exclude Ms. Kuhner's opinions, but the court denied that motion.  *See* Nov. 13, 2020 Order, ECF No. 48.  Ms. Kuhner is an attorney with many years' experience in migration studies, especially in Mexico.  *See generally* Expert Disclosure, Mot. in Limine Ex. A, ECF No. 36-1.  She has spent approximately the last decade as the director of the Institute for Women in Migration in Mexico City and has other work experience related to women who migrate.  *See id.* at 4–5.  In her current position she encounters many cases in which families are seeking access to birth certificates, dual nationality certificates, immigration

11

documents, and immigration visas. *See* Trial Tr. at 66:1–5. She formed the opinions expressed at trial in interviews with Mexican American parents about their experiences and social practices in 1990 with double registration. *Id.* at 80:7–10.

Although Ms. Kuhner's opinions are admissible, they are not conclusive. She never reviewed the Mexican birth certificate in question in this case, and she does not have any specific knowledge of the birth registration practices for the municipality of Coatlán del Río, where Brito's birth was registered and where the government alleges Brito was born. *See* Trial Tr. at 79–80. Ms. Kuhner only has a "sense of what social practices were in 1990 in terms of civil registries" and "double registration." *Id*. at 80:7–10. She can shed no light on whether the birth certificate was forged or improperly obtained. While the court credits Ms. Kuhner's knowledge of Mexican birth registration practices generally in the relevant time period, her opinions as applied to the local birth certificate at issue here have only limited weight. *See Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010), *as amended* (Apr. 27, 2010) (noting expert may testify and fact-finder decides how much weight to give testimony).

Nonetheless, Ms. Kuhner's opinions have explanatory value. Ms. Kuhner testified that when Brito was born in 1990, "there was no access to or no right to Mexican nationality, [no] automatic right . . . ." *Id*. at 81:7–11. Mexican families living in the United States without documentation "would come back to Mexico and register their children," even if their children had been born in the United States, "so that their children would have Mexican nationality as well as the U.S. nationality . . . ." *Id.* at 81:12–15. It is very common for grandparents in the country to register a birth without the child or parents present in the country. *See id*. at 88:5–9. She testified that grandparents "will go in and they say, you know, my son had a child, and here's the name. Here's the picture." *Id*. There were many reasons for families' doing this. Fear of deportation was one: Undocumented parents wanted their children to have Mexican birth certificates in case members of a family with mixed citizenship status were removed from the United States. *See id.* at 81:16–18. Tradition was another reason: Parents wanted their children to share their own nationality, and Mexican law did not ensure they would without registration. *See id.* at 81:19–21. Thus, if Brito were born in the United States to undocumented Mexican

nationals who did not have a United States birth certificate for him, his family would have been in good company in deciding to register his birth in Mexico. *Cf. Tapia-Felix v. Barr*, No. 15-01464, 2019 WL 2137314, at *7 (D. Ariz. May 16, 2019), (accepting Ms. Kuhner's testimony that "nearly half of the families with children born in the United States also register their U.S. citizen child's birth in Mexico"), *aff'd sub nom. Tapia-Felix v. Whitaker*, 827 F. App'x 691 (9th Cir. 2020), *cert. denied sub nom. Tapia-Felix v. Garland*, 141 S. Ct. 2520 (2021).

### c)    Conclusion

In sum, the record regarding the birth certificate issued by the Mexican government supports the following conclusions: The certificate itself appears to be an official government document but its formal issuance does not establish Brito's birth in Mexico.  Ms. Lopez credibly denies ever traveling to Mexico to register her son's birth, and Brito's Mexican birth certificate shows that his paternal grandmother registered his birth without Ms. Lopez present.[7]  *See* AR 1270–1276.  No evidence shows that anyone who actually witnessed Brito's birth registered his

---

[7] In its previous order, the court stated "it is undisputed the paternal grandmother registered Brito's birth." Prev. Order at 13, ECF No. 69.  In arguing for reconsideration, the government submits:

> [T]here is no evidence in the trial record or in the actual birth registry that Brito's paternal grandmother "registered Brito's birth" or requested the registration, and it was error for the Court to include this as part of the Court's conclusion regarding the birth registry. The birth registry merely includes the paternal grandmother as a "person other than parents who presents the registered." Exhibit A (English translation). This does not establish that Brito's parents were not persons who also accompanied the grandmother or that the grandmother alone "requested" the registration.

Mot. Recons. at 19.  This argument does not take account of the totality of the record as relevant here.  The record in this case contains two consistent birth certificates delivered by Mexican government officials to representatives of the United States government; both are certified.  *See* AR 1270–1276 (first birth certificate, cover letter identifying birth certificate as "certified copy of a birth certificate issued for [Brito], by the Clerk's office in Coatlán del Rio, Morelos, Mexico," and English translations); Gov't Ex. A at 3, 6 (second birth certificate and English translation).  The first birth certificate is more detailed and the government's argument appears to ignore it.  The first certificate states that neither Brito's mother nor father "appear[ed]" at his registration; rather an "other person" "appear[ed]" to register Brito's birth.  AR 1270, 1275.  In the section titled "person other than parents presenting (new-born child) for registration," the birth certificate lists only Brito's grandmother.  *Id.*

birth in Mexico. The legal conditions in Mexico in 1990 as credibly described by Ms. Kuhner support the inference that relatives of a child born in the United States to Mexican parents had incentives to register the child's birth in Mexico and could do so even if the child could claim U.S. citizenship.

### B. Conclusions of Law

#### 1. Brito's Burden: Preponderance of Evidence Standard Met

The "substantial credible evidence" standard requires Brito to prove his citizenship by a preponderance of the evidence. *See Giha v. Garland*, 12 F.4th 922, 930 (9th Cir. 2021). He has done so. His mother, Ms. Lopez, testified he was born in California, and for the reasons described in the court's findings of fact above, her testimony is credible. Her demeanor was credible. Her memory was detailed. Fundamentally, the birth of her son is something she reasonably remembers and knows about in meaningful detail. Ms. Lopez's relevant deposition testimony[8] and responses at trial were internally consistent and substantially consistent with other documentary and testimonial evidence, including the claims in her petition for a U visa and her testimony before other tribunals. She also has offered a credible explanation for the existence of the Mexican birth registration certificate and the circumstances giving rise to its creation, in the form of her testimony as bolstered by the expert testimony. Finally, her inconsistent testimony at one point about her precise arrival date in the United States and her conviction for wrongfully retaining money intended for the care of her disabled son do not undermine these conclusions. A reasonable fact-finder could credit Brito's evidence and find it shows he was born in the United States.

The government contends Brito's evidence is not in the same class as evidence courts have found to be "substantial credible evidence" in other cases. *See* Gov't Resp. at 3 ("[C]itizenship cases . . . the Ninth Circuit [affirmed] since *Mondaca-Vega* . . . [have] relied on much more than the testimony of a single interested witness in determining whether the plaintiff met the substantial credible evidence burden."). The court rejects this argument for two reasons.

---

[8] The court relies here on the characterization of Ms. Lopez's deposition testimony memorialized in the undisputed facts set out in the Amended Final Pre-Trial Order, ECF No. 43.

First, the government has cited no authority articulating a corroboration requirement, and "[t]estimony should not be disregarded merely because it is uncorroborated and in the individual's own interest." *Murphy v. I.N.S.*, 54 F.3d 605, 611 (9th Cir. 1995) (finding BIA erred by affording too little weight to alleged noncitizen's evidence of citizenship that comprised only his own testimony, including his "plausible explanation of the lack of corroborating evidence"). Second and in any event, the government's argument depends on the court's accepting its characterization of Ms. Lopez's testimony as "uncorroborated," which the court does not. Ms. Lopez's account of her son's birth has been consistent for many years, even before his citizenship status became the subject of the charges in this case. *See* Pl.'s Ex. C-1[9] at 7 (attesting in 2010 U Visa application that Brito was born in United States). Other related aspects of her testimony are corroborated by her 2018 deposition testimony. *See* UF No. 7 ("Ms. Lopez testified at her deposition that she came to the United States in May 1989 'with a lot of people," including Brito's father.). As explained above, her claims also gain some added meaning by virtue of Ms. Kuhner's opinions.

    **2.    The Government's Burden: Clear and Convincing Standard Not Met**

Because Brito has offered substantial credible evidence of his U.S. citizenship, the presumption of his foreign birth "bursts." *Ayala–Villanueva*, 572 F.3d at 737 n.3. The government can prevail only by proving Brito is removable by "clear and convincing evidence." *Giha*, 12 F.4th at 929.

The government has not carried that burden. Its sole evidence of Brito's foreign birth is the Mexican birth certificate. That was enough to satisfy the government's step-one burden. But the question at step three is "whether sufficient evidence warrants disregarding the petitioner's proof of citizenship." *Mondaca-Vega* at 419–20 (citation, internal quotation marks, and alterations omitted); *see also Whitmore v. Dep't of Labor*, 680 F.3d 1353, 1368 (Fed. Cir. 2012) ("Evidence only clearly and convincingly supports a conclusion when it does so in the aggregate

/////

---

[9] As above, the court relies here on Ms. Lopez's petition for U Nonimmigrant Status only as containing a prior consistent statement about the location of Brito's birth.

15

considering all the pertinent evidence in the record, and despite the evidence that fairly detracts from that conclusion."). Here it does not.

Although the parties agree the Mexican birth certificate is an authentic government document, *see* Trial Tr. 36:25–37:4, the inferences the government would have the court draw from its existence are not the only reasonable conclusions when considering all the information in the record now before the court. The Mexican birth certificate was registered three months after Brito's undisputed birth date, with the delayed registration raising a potential red flag. *See Tiznado-Reyna v. Holder*, No. 14-02428, 2016 WL 3213221, at *5 (D. Ariz. June 10, 2016) ("A delayed birth certificate is entitled to less evidentiary weight than a contemporaneously filed birth certificate."). Ms. Lopez credibly testified she neither traveled to Mexico to register Brito, *see* Trial Tr. at 58:11–12, nor signed the birth certificate, *see* AR 138:13–17. She proposed a credible, alternative explanation for the existence of the document. *See id.* at 163–164 (suggesting Brito's father registered or arranged for the registration of Brito's birth in Mexico). And Ms. Kuhner explained that many authentic birth certificates issued in 1990 to children who were not born in Mexico. *See* Trial Tr. at 88:5–9 (noting it was socially "acceptable" and "very, very common" for grandparents in Mexico to register a birth without the child or parents present in the country).

Fundamentally, given the sparseness of the record before the court, this case turns on Ms. Lopez's credibility; simply put, the court found her fully credible. It confirms that finding here after reconsideration, to the extent granted above. The government has not carried its burden to disprove Brito's U.S. citizenship "by clear, unequivocal, and convincing evidence." *Berenyi v. Dist. Dir.*, *INS*, 385 U.S. 630, 636 (1967).

**III. CONCLUSION**

The court finds Brito has produced "substantial credible evidence," by a preponderance of the evidence, of his U.S. citizenship. The government has not shown by "clear, unequivocal, and convincing evidence" that Brito is not a U.S. citizen. On the record developed before this court, Brito is a U.S. citizen.

/////

1     The Clerk of Court is **directed** to serve a copy of this order on the Ninth Circuit.

2     IT IS SO ORDERED.

3  DATED: September 14, 2022.

_____
CHIEF UNITED STATES DISTRICT JUDGE